IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


ROSHAWN RANDALL,                                    No. 3:17-cv-00807-HZ

                    Plaintiff,                      OPINION & ORDER

        v.

UNITED PARCEL SERVICE, INC.,

                    Defendant.



Daniel Snyder
Carl Post
John Burgess
LAW OFFICES OF DANIEL SNYDER
1000 SW Broadway, Suite 2400
Portland, Oregon 97205

        Attorneys for Plaintiff

Calvin L. Keith
Cody M. Weston
Edward Choi
PERKINS COIE LLP
1120 NW Couch Street, Tenth Floor
Portland, Oregon 97209

        Attorneys for Defendant

HERNÁNDEZ, District Judge:

Plaintiff Roshawn Randall brings this employment action against Defendant United Parcel Service, Inc. for gender and race discrimination and retaliation under 42 U.S.C. § 2000e, gender and race discrimination and retaliation under Or. Rev. Stat. § 659A.030(1)(b), whistleblower retaliation and discrimination under Or. Rev. Stat. § 659A.199, and unpaid wages under Or. Rev. Stat. § 652.140. Defendant brings counterclaims for breach of contract and quantum meruit/unjust enrichment. Defendant moves for summary judgment on all of Plaintiff's claims and its counterclaims. The Court grants in part and denies in part Defendant's Motion for Summary Judgment.

## BACKGROUND

Plaintiff began working for Defendant in 2006. Choi Decl. Ex. 1 (Randall Dep.) 33:4–7, ECF 34–1. After various transitions and promotions, Plaintiff eventually started working in Coeur d'Alene, Idaho, first as a part-time supervisor and then as an Operations Management Specialist and package car driver. *Id.* at 34:24–35:22. In March of 2015, Plaintiff asked Division Manager Paul Bond whether there were any open full-time supervisor positions. *Id.* at 48:16–49:14; Choi Decl. Ex. 4 (Bond Dep.) 25:11–26:23, ECF 34–4. When Plaintiff did not hear from Mr. Bond, Plaintiff and his wife entered a one-year lease to rent a home in Coeur d'Alene. Randall Decl. ¶¶ 9–10, ECF 41.

The Management Career Opportunities ("MCO") program is an online application process managed by Defendant's Human Resources Department for UPS employees seeking new positions within UPS. Choi Decl. Ex. 4 (Bond Dep.) 25:15–22. Through this program, Plaintiff was contacted in the summer of 2015 by Center Manager Kelly Nobles about a full-time supervisor position in The Dalles, Oregon. Choi Decl. Ex. 3 (Nobles Dep.) 7:16–8:7, ECF 34–3.

The position that was available at the time was the "On-Road Supervisor" position, which was a full-time supervisor position in the The Dalles Center responsible for managing package car drivers and supervising other center employees. Snyder Decl. Ex. 3 (Bond Dep.) 32:17–33:14, ECF 40–1; Choi Decl. Ex. 3 (Nobles Dep.) 35:2–13. After interviewing with Division Manager Phil Taylor and Mr. Nobles in August of 2015, Plaintiff was hired for the supervisor position in The Dalles. Choi Decl. Ex. 3 (Nobles Dep.) 10:3–11:19; Choi Decl. Ex. 8 (Taylor Dep.) 5:5– 9:22, ECF 34–8; Randall Decl. ¶ 11. During his employment, he was the only African-American employee at the Center. Snyder Decl. Ex. C (Bond Dep.) 39:9–21.

Plaintiff says that he informed UPS Human Resources that he had signed a one-year lease in Coeur d'Alene and was told that the position in The Dalles was temporary or less than one year. Randall Decl. ¶ 11. Plaintiff subsequently discussed his new position with Mr. Nobles and Mr. Taylor by phone. *Id.* at ¶ 12; Choi Decl. Ex. 3 (Nobles Dep.) 10:22–11:7; Choi Decl. Ex. 8 (Taylor Dep.) 5:5–9:12. He informed them again that he would not be moving his family to Oregon because he had signed a one-year lease in Coeur d'Alene. Randall Decl. ¶ 12. No one told Plaintiff he was required to move to The Dalles. *Id.* Allegedly, both Mr. Taylor and Mr. Nobles confirmed that this would be a short-term assignment until he could take a management position in Idaho. *Id.* at ¶ 16.

I.     **Issues with Personal Expenses**

In August and September of 2015, Mr. Nobles and Mr. Taylor informed Plaintiff that lodging, meals, and a rental car would be paid for by UPS because of his MCO job classification. Randall Decl. ¶¶ 15– 17; Snyder Decl. Ex. C (Bond Dep.) 58:18–22. Plaintiff alleges he was expressly told he could use the UPS American Express card for these expenses. Randall Decl. ¶¶ 15– 17. He was also told he could use the UPS Visa "Pro Card" for driver and employee spiffs

and meals. *Id.* at ¶ 17. Plaintiff testified that he did not receive adequate or accurate training on how to complete his expense reports. Snyder Decl. Ex. G (Randall Dep.) 115:19–116:19, ECF 40–2.

On October 1, 2015, Donald Tefft, Jr., UPS's Director of Human Resources for the Northwest District through April 1, 2016, held a meeting with Plaintiff and Mr. Taylor. Choi Decl. Ex. 9 (Tefft Dep.) 24:4–25:14, ECF 34–9. Plaintiff had not moved to The Dalles, and Mr. Tefft felt that his performance was struggling, in part because of his regular commute to and from Coeur d'Alene. *Id.* at 26:8–27:4. Plaintiff was told at this meeting that Defendant would no longer pay for his commuting costs and that he would need to relocate to The Dalles. Choi Decl. Ex 1 (Randall Dep.) 21:10–22:25.

In a subsequent email to Plaintiff, Mr. Nobles confirmed that Defendant was not going to cover mileage for his trips between The Dalles and Coeur d'Alene or meal and hotel expenses unless they were business expenses. Grant Decl. ¶ 2, Ex. 1, ECF 32; Choi Decl. Ex. 3 (Nobles Dep.) 83:18–84:4. Mr. Nobles emphasized that the MCO program requires self-relocation. *Id.* Plaintiff eventually acquired a studio apartment in Hood River, but his family remained in Coeur d'Alene. Choi Decl. Ex. 1 (Randall Dep.) 21:10–22:25; Randall Decl. ¶ 35. When his father died on October 2, Plaintiff asserts that Mr. Nobles told Plaintiff he could put the flight and hotel for his father's funeral on the company credit card. Randall Decl. ¶ 34.

In early 2016, the new Division Manager for The Dalles—Paul Bond—received a copy of Plaintiff's expense reports for September through December 2015 related to the company-issued American Express credit card. Choi Decl. Ex. 4 (Bond Dep.) 56:20–24; Grant Decl. ¶ 3, Ex. 2; Choi Decl. Ex. 3 (Nobles Dep.) 71:12–72:24. Mr. Nobles approved Plaintiff's expense reports. Choi Decl. Ex. 3 (Nobles Dep.) 136:18–25. Mr. Nobles contends that in doing so he only

approved expenses so that finance could pay the amount charged and was not "agreeing to the payments that Randall made as UPS payments." *Id.* Mr. Bond, however, testified that it would have been Mr. Nobles' responsibility to "disallow any expense that he did not think were appropriate business expenses. . . ." Snyder Decl. Ex. C (Bond Dep.) 57:6–10.

According to the expense report, Plaintiff had charged approximately $20,000 in personal expenses—including fuel, meals, lodging expenses, dry cleaning, and birthday dinners—to the American Express card. Grant Decl. Ex. 2 at 3:9; 4:15, 25; 5:64–71, 83, 84, 89; 10:255, 264; 11:332. Human Resources asked David Brandon and Brian Coy, the Director of Security and a Security Manager respectively, to investigate Plaintiff's reports. Choi Decl. Ex. 6 (Coy Dep.) 10:10–11:20, ECF 34–6. Mr. Nobles sent another email to Plaintiff on January 8, 2016, reiterating that Plaintiff was "no longer on company expense for lodging, vehicle and meals." Grant Decl. ¶ 4, Ex. 3. On February 11, 2016, Plaintiff signed a statement that he had been "notified today by District Manager Paul Bond of expenses acquired by [himself]" and "as of February 11, 2016 all charges on [his] American Express card [would] only be for business purposes." Grant Decl. ¶ 5, Ex. 4.

On February 17, 2016, Plaintiff met with Mr. Grant (HR Operations Manager for the Northwest District), Mr. Coy, Mr. Bond and Mr. Taylor to discuss the expense reports. Grant Decl. ¶ 6. Plaintiff was instructed to highlight personal charges. *Id.*; Choi Decl. Ex. 2 (Grant Dep.) 74:21–75:5, ECF 34–2; Choi Decl. Ex. 1 (Randall Dep.) 94:2–16. Plaintiff signed a statement acknowledging that his use of the American Express card constituted a violation of company policy. Grant Decl. ¶ 6, Ex. 5. Plaintiff also agreed to reimburse Defendant for the personal transactions. *Id.* Plaintiff asserts that he completed the statement because he felt coerced and could not defend himself without risking termination. Randall Decl. ¶¶ 45–46. Defendant

placed Plaintiff on paid leave while it completed its investigation. Choi Decl. Ex. 2 (Grant Dep.) 44:16–45:15. Mr. Grant testified that this paid leave was not considered a disciplinary action. *Id.* at 45:10–15.

On March 15, 2016, Plaintiff attended another meeting with Mr. Grant, Mr. Tefft, and Mr. Bond. Grant Decl. ¶ 7. Mr. Tefft told Plaintiff he was going to be disciplined for his violations of the UPS expense policy. Choi Decl. Ex. 9 (Tefft Dep.) 107:5–108:20. Plaintiff would not receive a raise that year, was not eligible to participate in the Management Incentive Program ("MIP") that year, had to turn in his company American Express card, and would be required to repay the improper personal expenses. *Id.* Plaintiff again signed a statement acknowledging the consequences of his actions and was permitted a second opportunity to review the expense reports and deduct purely business expenses. Grant Decl. ¶ 7, Exs. 6, 7; Choi Decl. Ex. 2 (Grant Dep.) 76:17–77:12.

Later that day, Mr. Tefft and Mr. Grant learned that Plaintiff had also used the Pro Card for personal charges, Choi Decl. (Grant Dep.) 81:12–82:11, 103:12–104:13, 105:24–107:5; Choi Decl. Ex. 3 (Nobles Dep.) 71:12–72:24, including a massage and multiple meals, Choi Decl. Ex. 2 (Grant Dep.) 104:8–13; Grant Decl. ¶ 7, Ex. 6. After adding these charges to the amount Plaintiff was to repay to UPS, Plaintiff entered a repayment plan by which a sum would be withheld from his monthly paychecks. Grant Decl. ¶ 7, Ex. 7.

On May 9, 2016, Plaintiff asked Mr. Grant to review his expense reports for January through April 2016. Randall Decl. ¶ 60. When he did not receive a response that day, he submitted them to Mr. Nobles, who told Plaintiff he had approved the report. *Id*. After reviewing the reports, Mr. Bond emailed Mr. Grant, Mr. Coy, and Mr. Brandon noting certain personal medical expenses, duplicative fuel and mileage charges, and other suspicious transportation

expenses. Grant Decl. ¶ 9, Ex. 9; Choi Decl. Ex. 1 (Randall Dep.) 67:14–69:23. Mr. Grant, who replaced Mr. Tefft as Human Resources Director for the Northwest District in March, met with Plaintiff, Mr. Brandon, and Mr. Coy on May 19, 2016, to discuss these expenses. Grant Decl. ¶¶ 1, 10; Choi Decl. Ex. 2 (Grant Dep.) 47:15–49:11. They also discussed a November 2015 charge for a meal at a local taqueria with a co-worker that, contrary to Plaintiff's prior statements, had involved the purchase of alcoholic beverages outside of business hours. Grant Decl. ¶ 10, Ex. 10; Choi Decl. Ex. 6 (Coy Dep.) 44:2–46:24. Plaintiff again signed a written statement acknowledging these violations. Grant Decl. ¶ 11, Ex. 11.

On June 5 or 6, Mr. Grant decided to terminate Plaintiff's employment. Choi Decl. Ex. 2 (Grant Dep.) 67:16–68:13. On June 7—the day of Plaintiff's termination—Mr. Grant conferred with Mr. Nobles about this decision prior to meeting with Plaintiff. *Id.* at 18:4–20:13; Choi Decl. Ex. 3 (Nobles Dep.) 98:11–99:16. Mr. Grant and Mr. Nobles allegedly decided to terminate Plaintiff's employment because of the repeated violations of UPS's expense policies. Choi Decl. Ex. 2 (Grant Dep.) 18:4–20:13. Specifically, Mr. Grant testified that Plaintiff's duplicative fuel and mileage reimbursement drove his decision to terminate Plaintiff. *Id.* at 22:2–13, 27:19–28:15. They met with Plaintiff in The Dalles to inform him that he was being terminated. Choi Decl. Ex. 1 (Randall Dep.) 200:17–201:1. Plaintiff resigned via email later that day. Grant Decl. ¶ 12, Ex. 12.  Mr. Grant testified that only Mr. Nobles had input in the termination decision, Choi Decl. Ex. 2 (Grant Dep.) 19:4–23, but Mr. Bond testified that he provided input to managers, including Mr. Brandon and Mr. Tefft, regarding the decision to terminate Plaintiff, Snyder Decl. Ex. C (Bond Dep.) 16:10–25. Plaintiff was replaced by a Caucasian employee. *Id.* at 83:5–9.

Despite issues with his expense report, some evidence suggests Plaintiff performed his job at The Dalles Center well. Brianne Kinder, a part-time supervisor at the Center, and Mr. Taylor testified that while Plaintiff was a supervisor there was no increase in any misloads or other performance problems at The Dalles Center. Snyder Decl. Ex. E (Kinder Dep.) 12:22–13:3, ECF 40–1; Snyder Decl. Ex. I (Taylor Dep.) 31:21–24, ECF 40–2. Mr. Bond testified that overall performance worsened but did not attribute any increase in misloads to Plaintiff. Snyder Decl. Ex. C (Bond Dep.) 48:17–49:2, 50:1–4, 63:6–13. Plaintiff alleges he was told he and Mr. Nobles were going to receive an award for improved budgeting at the Center. Randall Decl. ¶ 40. He also alleges that performance issues worsened while he was on paid leave in February and March of 2016. *Id.* at ¶ 53. Despite issues with Plaintiff's performance in training, Mr. Grant allegedly told Plaintiff he had been performing well at the Center. *Id.* at ¶ 65.

## II.    Alleged Incidents of Discrimination and Harassment

Not long after he started working in The Dalles, Plaintiff alleges the harassment and discrimination began. In September of 2015, Ms. Kinder sent a text message to Plaintiff that stated he could "fuck her from behind and pull her hair." Choi Decl. Ex. 1 (Randall Dep.) 137:19–138:11. After reporting this text message to Mr. Nobles, Mr. Nobles asked Plaintiff if he was having a relationship with Ms. Kinder. Randall Decl. ¶ 28. Human resources never contacted Plaintiff about the text message. *Id.* at ¶ 28. But Plaintiff and Mr. Nobles met with Ms. Kinder the day after he received it to discuss it. Choi Decl. Ex. 1 (Randall Dep.) 138:12–25. Ms. Kinder explained that an ex-boyfriend had taken her phone while visiting their children and sent inappropriate messages to many of her contacts, including Plaintiff. Choi Decl. Ex. 1 (Randall Dep.) 138:12–25; Choi Decl. Ex. 7 (Kinder Dep.) 23:23–29:9, ECF 34–7.

Plaintiff asserts that he did not believe her explanation. Randall Decl. ¶ 28. But Mr. Nobles testified that Plaintiff conveyed he was satisfied with this explanation and determined they did not need involve human resources. Choi Decl. Ex. 3 (Nobles Dep.) 43:12–45:16, 47:6–48:5. Plaintiff also asserts that he told Mr. Tefft and Mr. Grant about the text message on October 1, 2015, and Mr. Tefft acted like Plaintiff "was at fault." Randall Decl. ¶ 31. After Plaintiff's termination, Debbie Bozich, a human resources employee, interviewed Ms. Kinder about the text message when it was brought it to her attention. Snyder Decl. Ex. E (Kinder Dep.) 29:18–30:6.

Ms. Kinder also allegedly opened personal mail directed at Plaintiff. Randall Decl. ¶ 19. After opening a thank you letter from a friend, Plaintiff recalls Ms. Kinder accusing Plaintiff of having an affair. *Id.* Ms. Kinder also believed that her co-worker Tiffany Barrett was having a sexual relationship with Plaintiff. Snyder Decl. Ex. E (Kinder Dep.) 18:23–25, 23:17–22.

On October 1, 2015, Plaintiff received a text message from Ms. Barrett, another female supervisor at The Dalles Center. Compl. ¶ 23. In the text message, Ms. Barrett expressed frustration with Plaintiff and work, stating in relevant part:

> Do you also know I went straight to the bar and just balled my fucking eyes out for the 1st time bc of that fucking job. When you don't communicate With me or seven [sic] give me a fuck you back it really drives me up a wall at times I'm gonna need guidance. *My anxiety right now is fucking off the charts bc your black* [emoji] no but really you wanna sit and listen to me about drivers and listen to what I hear.

Choi Decl. ¶ 11, Ex. 10 (emphasis added). Plaintiff alleges that he reported the text message to Mr. Nobles. Choi Decl. Ex. 1 (Randall Dep.) 144:15–23. Plaintiff testified that Mr. Nobles spoke with Ms. Barrett about it. *Id.* at 144:23–146:6. But Ms. Barrett testified that neither Mr. Nobles nor anyone from human resources ever talked to her about this text. Snyder Decl. Ex. D (Barrett Dep.) 30:25–31:8.

Plaintiff also alleges that Ms. Barrett went over his head and spoke with Mr. Nobles directly when given work instructions by Plaintiff, and that he considered this conduct to be discriminatory in nature. Choi Decl. Ex. 1 (Randall Dep.) 146:24–147:14. Ms. Barrett testified that she did so because she was hired by Mr. Nobles and did not view Plaintiff as her supervisor. Snyder Decl. Ex. D (Barrett Dep.) 25:14–23, ECF 40–1.

Plaintiff alleges that he experienced harassment from another part-time supervisor Tanya Richardson. Snyder Decl. Ex. F (Richardson Dep.) 15:24–16:3, ECF 40–2. Allegedly Ms. Richardson was insubordinate and would often act out at work, breaking down, crying hysterically, and faking seizures. Choi Decl. Ex. 1 (Randall Dep.) 123:16–125:2. Plaintiff attributes a discriminatory motive to her behavior because she would go directly to Mr. Nobles instead of listening to Plaintiff's instructions. *Id.* at 125:7–127:10. Plaintiff alleges that Ms. Richardson allegedly commented that he was a "black man" and "normally aggressive." *Id.* at 135:11–136:4. Ms. Richardson also allegedly told Plaintiff "I think you don't like me because you are spending so much time with Sarah Jones training her" and testified that others at work believed something had been going on between Ms. Jones and Plaintiff. Snyder Decl. Ex. F (Richardson Dep.) 54:3–56:7; Randall Decl. ¶ 38. Plaintiff asserts that when he returned to work on March 21, 2016, Ms. Richardson entered Plaintiff's office and slammed and kicked objects around. Randall Decl. ¶ 54.

Plaintiff also testified that in May of 2016, he received calls from other part-time supervisors about Ms. Richardson's behavior. Choi Decl. Ex. 1 (Randall Dep.) 129:4–130:23. Plaintiff instructed employees and supervisors to send written statements about these incidents to human resources. *Id.* On May 23, after receiving these statements, Human Resources visited the The Dalles Center to investigate. Grant Decl. ¶ 15, Exs. 14, 15. Approximately a week later,

Plaintiff and Ms. Richardson had another dispute over work coverage, and Ms. Richardson yelled that she was "fucking done" and intended to quit. *Id.* at ¶ 17, Ex. 16. She also expressed her intent to call human resources to get Plaintiff fired. *Id.* Again, Ms. Bozich investigated the incident and interviewed employees about what had happened. While meeting with Ms. Richardson to discuss some of these issues, Ms. Richardson walked out of the interview and resigned from her position. Choi Decl. Ex. 5 (Bozich Dep.) 30:16–31:24, 34:18–37:1, ECF 34–5.

Plaintiff asserts that after his October 1, 2015 meeting, he met with the area manager of Human Resources and reported conduct issues with Ms. Barrett, Ms. Kinder, and Ms. Richardson. Randall Decl. ¶ 33. Human Resources allegedly responded by instructing him to find a working relationship with these individuals. *Id.* He allegedly reported the harassing behavior of Ms. Barrett and Ms. Richardson—as well their performance issues—to Mr. Nobles on a weekly basis. *Id.* at ¶¶ 21, 54. Plaintiff also claims that he reported to Mr. Nobles that both Ms. Kinder and Ms. Richardson were falsifying their time cards. *Id.* at ¶ 39

The same day Plaintiff was terminated, an employee working on special assignment with UPS allegedly said "white is right" to Plaintiff during a dispatch training and held a pocketknife to Plaintiff's rib cage. Choi Decl. Ex. 1 (Randall Dep.) 200:10–203:15. Plaintiff testified that he reported this incident to Mr. Nobles prior to his termination. *Id.* at 203:16–204:4. According to Defendant, "white is right" and similar statements are often used to refer to the color code for Defendant's Package Dispatch System. Choi Decl. Ex. 4 (Bond Dep.) 93:22–94:15. The system monitors whether drivers have an appropriate number of packages and delivery stops. *Id.* A white line indicates that they are dispatched "just right" with an appropriate number of packages and stops. *Id.*

Plaintiff alleges he was treated unfairly because of his race by Mr. Bond, the Division Manager from October 2015 to the end of Plaintiff's employment. Choi Decl. Ex. 8 (Taylor Dep.) 15:8–25. He asserts that he was treated differently from other supervisors, told to work longer hours, and prohibited from leaving the Center to attend weekly meetings in Hermiston. Randall Decl. ¶ 57. During a visit to the Center on February 11, 2016, Mr. Bond allegedly yelled at Plaintiff to "get out" of a meeting he was leading with package car drivers, ordered him to recite the "Ten Point Commentary and Five Seeing Habits" for UPS drivers,[1] criticized Plaintiff for his poor performance, and put the Center on a performance review plan. Id. at ¶ 41.

Plaintiff testified at his deposition that he informed Ms. Bozich of this behavior on February 11 and told her he believed he was being treated differently by Mr. Bond. Choi Decl. Ex. 1 (Randall Dep.) 105:8–106:9; Randall Decl. ¶ 42. According to Plaintiff, Ms. Bozich responded that people in the management position often do not treat their subordinates well but "that's how it is." Randall Decl. ¶ 42. He also alleges he reported feeling discriminated against by Mr. Bond during his February 17, 2016 meeting to Mr. Tefft, Mr. Grant, and Mr. Coy. Id. at ¶ 45. Plaintiff alleges that Mr. Tefft and Mr. Grant ended the conversation and told him they would not discuss race again. Id. On March 3, 2016, while Plaintiff was on leave, he sent an email to Ms. Bozich and Mr. Grant in which he states that he reported Mr. Bond's discriminatory conduct to Ms. Bozich on February 11. Grant Decl. ¶ 14, Ex. 13.

At the March 15 meeting, Mr. Tefft and Mr. Grant addressed Plaintiff's concerns about the February incident with Mr. Bond. They testified that the February 11 meeting was a focus group intended solely for drivers, and Mr. Bond told Plaintiff to leave the meeting because he was a supervisory employee. Choi Decl. Ex. 2 (Grant Dep.) 53:15–56:17; Choi Decl. Ex. 9 (Tefft

---

[1] The Ten Point Commentary is UPS's safety methods, and the Five Seeing Habits are safety methods for operation of a vehicle. Choi Decl. Ex. 9 (Tefft Dep.) 74:18–20.

Dep.) 71:12–73:3. According to Mr. Tefft, it is also "common practice" to ask employees to recite the Ten Point Commentary and Five Seeing Habits. Choi Decl. Ex. 9 (Tefft Dep.) 73:14–75:18. Mr. Bond had asked Plaintiff to recite them because he had recently failed a workshop. Choi Decl. Ex. 4 (Bond Dep.) 68:10–15. Mr. Bond generally had a difficult working relationship with employees. Snyder Decl. Ex. F (Ricahrdson Dep.) 27:10–28:3; Kilby Decl. ¶ 8, ECF 42; Sallee Decl. ¶ 7, ECF 43. After this conversation with Plaintiff, Mr. Grant looked for coaching opportunities for Mr. Bond. Grant Decl. ¶ 14. At some point, Mr. Bond was told by Mr. Grant not to have direct contact with Plaintiff, Snyder Decl. Ex. C (Bond Dep.) 91:14–17, but Mr. Grant does not recall having given this direction, Snyder Decl. Ex. H (Grant Dep.) 59:4–6, ECF 40–2.

Plaintiff also had issues with Mr. Taylor. In September 2015, soon after Plaintiff began working at The Dalles Center, Plaintiff answered a call from Mr. Taylor, who asked to speak to Mr. Nobles. Plaintiff replied "Phil, why is that when you know I am the only manager in the Center you still ask for Kelly Nobles? Is the reason you don't want to talk to me because I am black?" Randall Decl. ¶ 29. Mr. Taylor testified at his deposition that he conveyed to Plaintiff he was offended by this statement at some point prior to the October 1 meeting with Mr. Grant. Snyder Decl. Ex. I (Taylor Dep.) 28:24–29:25. Mr. Taylor allegedly told Plaintiff he was offended by this question again in February when Plaintiff met with management about his personal expenditures. Randall Decl. ¶ 45. Plaintiff told the managers that this had happened repeatedly. *Id.* In response, Mr. Tefft and Mr. Grant are alleged to have told Plaintiff to never bring up his race at work again. *Id.* According to Mr. Tefft, Plaintiff said that his comment to Mr. Taylor had been intended as a joke, and Mr. Tefft told Plaintiff that such jokes were inappropriate and unprofessional. Choi Decl. Ex. 9 (Tefft Dep.) 32:30–34:19.

Plaintiff also cites other incidents of harassment. For example, he asserts that he was criticized and reprimanded by Mr. Nobles and Mr. Tefft because he described his long working hours in a letter he was required to write to the UPS Vice President as a new full-time supervisor. Randall Decl. ¶ 22. Plaintiff also states that he had a conflict with a Caucasian driver named Eric Bartholomew, who allegedly called Randall "stupid." *Id.* at ¶ 26. Nobles refused to allow Randall to take any action regarding Plaintiff's problems with Mr. Bartholomew. *Id.* He also contends that he reported daily incidents of assaultive and violent behavior by three drivers against one other driver to Mr. Nobles on March 22, 2016, but Mr. Nobles did not take any action. *Id.* at ¶ 55.

## III.     Post-Termination Allegations

UPS employees accrue vacation time on a pro-rata basis. Stewart Decl. Ex. 1 at 1, ECF 33. Employees who work for UPS for 10 to 19 years are entitled to four weeks of vacation per year. *Id.* at 3. On June 8, 2016, Defendant compensated Plaintiff for eleven days of accrued vacation time in his final paycheck. *Id.* at Ex. 2.

Prior to his termination, Plaintiff sought mileage reimbursement for $909.57. Defendant paid this amount to Plaintiff in April 2017 after numerous failed attempts at mailing the reimbursement check to Plaintiff at his home and attorney's office in June and October of 2016. *Id.* at Exs. 3–5.

The Management Inceptive Program or "MIP" is a bonus awarded to certain management employees recommended by their division manager. *Id.* at ¶ 7. To qualify for a MIP award, an employee must be employed in a management position on December 31 of the bonus year. *Id.* at Ex. 6. Plaintiff was issued a 2015 MIP Award Statement that indicates he was paid $5,155.25 in gross income in the form of 31.25 shares of company stock in March of 2016. *Id.* at Ex. 7.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (internal

quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

Defendant moves for summary judgment on all of Plaintiff's discrimination, retaliation, and wage claims and its counterclaims for breach of contract and unjust enrichment/quantum meruit. Def. Mot. Summ. J. ("Def. Mot."), ECF 31. The Court agrees with Defendant that it is entitled to summary judgment on Plaintiff's claim for unpaid wages. However, when viewing the evidence in the light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that Plaintiff was discriminated and retaliated against on the basis of his race and gender in violation of federal and state law. Accordingly, the Court otherwise denies Defendant's motion.

## I.       Plaintiff's Claims

In moving for summary judgment on Plaintiff's discrimination and retaliation claims, Defendant primarily argues that: (1) Defendant terminated Plaintiff for a legitimate non-discriminatory reason and Plaintiff cannot show pretext; (2) there is no evidence that UPS management had a discriminatory or retaliatory motive; and (3) Plaintiff's allegations of harassment are not sufficiently severe or pervasive to constitute an actionable hostile work environment. Def. Mot. 2. Defendant also argues that there is no dispute of material fact that Defendant paid Plaintiff his wages at the end of his termination. *Id.* 31–32.

///

///

A.  Discrimination

Plaintiff brings claims for race and gender discrimination under Title VII and Oregon law. *See* 42 U.S.C. § 2000e, et. seq.,; Or. Rev. Stat. ("ORS") 659A.030(1)(b). Under both statutes,[2] Plaintiff may establish a prima facie case for disparate treatment through direct or circumstantial evidence. *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004). A prima facie case for disparate treatment claims can also be established through the *McDonnell Douglas* burden-shifting framework. *Id.*; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, the plaintiff must first show that: (1) he belongs to a protected class; (2) he was performing according to his employer's legitimate expectations; (3) he has suffered an adverse employment action; and (4) "similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 690–91 (9th Cir. 2017) (citing *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010)). Once the plaintiff has made out his prima facie case, "the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 691 (citing *Hawn*, 615 F.3d at 1155). "If the defendant meets this burden, then the plaintiff 'must then raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere pretext for unlawful discrimination.'" *Id.* (quoting *Hawn*, 615 F.3d at 1155). The court

---

[2] Plaintiff's federal and state discrimination and retaliation claims are analyzed using the same legal standards. *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001) ("The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used under federal law."); *Delima v. Home Depot USA, Inc.*, 616 F.Supp.2d 1055, 1091 (D. Or. 2008) (applying the same standard to retaliation claims under Title VII and ORS 659A.030); *Friday v. City of Portland*, No. CV-00-278-JE, 2005 WL 189717, at *9 (D. Or. Jan. 26, 2005) (analyzing hostile environment claim under ORS 659A.030 using Title VII standards and noting that Oregon courts follow the reasoning of federal decisions on Title VII). The *McDonnell Douglas* burden-shifting analysis also applies to both discrimination and retaliation claims. *Snead*, 237 F.3d at 1091–93.

requires "very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record." *Id.*

Under the first part of the test, neither party disputes that Plaintiff belongs to a protected class and suffered an adverse employment action. Instead, they dispute whether (1) Plaintiff performed according to his employer's legitimate expectations and (2) similarly situated employees were treated more favorably or other evidence gives rise to an inference of discrimination.[3] The Court finds that, on both issues, there are reasonable disputes of material fact.

First, there is conflicting evidence as to whether Plaintiff was performing according to his employer's legitimate expectations. "[T]he crux of this element [is] whether the plaintiff adequately performed [his] job, which suggests a standard less than perfect performance." *Whitley v. City of Portland*, 654 F.Supp.2d 1194, 1208 (D. Or. 2009) (internal citations and quotations omitted). In support of its argument that Plaintiff was not adequately performing his job, Defendant emphasizes Plaintiff's violations of Defendant's expense policies. Def. Mot. 21. But there is a question of fact as to whether at least some of these expenses were allowed by UPS. Though Plaintiff admitted to being familiar with Defendant's reimbursement policies, Choi Decl. Ex. 1 (Randall Dep.) 54:5–18, he also contends that he received conflicting information about whether certain charges were permissible business expenses, Snyder Decl. Ex. G (Randall Dep.) 55:24–57:4, 71:11–18 (testifying that Mr. Nobles had given him permission to charge certain expenses to UPS). Mr. Nobles also approved Plaintiff's expense reports. In addition,

---

[3] Plaintiff does not appear to contend that he has any direct evidence of discrimination, and the Court finds none. As Defendant points out, none of the persons involved in the decision-making process appear to have made statements or conducted themselves in a way that could be viewed as directly reflecting the alleged discriminatory attitude "without inference or presumption." *See Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003).

there is conflicting evidence as to whether Plaintiff was adequately performing the day-to-day requirements of his job. Though Mr. Tefft and Mr. Bond conveyed some concerns to Plaintiff about his job performance, Plaintiff cites statements from the part-time supervisors as well as Mr. Grant indicating that he was doing well as the supervisor of the Center. There is, accordingly, a dispute of fact on this element of Plaintiff's prima facie case.

Second, viewing the evidence in the light most favorable to Plaintiff, there is at least some evidence to suggest that a racially discriminatory motive may have been an impetus for his termination. *See e.g. Reynaga*, 847 F.3d at 690–91 (providing the last element of the prima facie case requires the plaintiff to demonstrate "similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination"). Plaintiff, the only African-American supervisor in his division, alleges that he reported incidents of race and sex discrimination by his part-time supervisors, Mr. Bond, and Mr. Taylor to Mr. Nobles and various individuals in human resources, but many complaints appear to have gone uninvestigated. Both Mr. Nobles and Mr. Grant, Director of Human Resources for the Northwest District, were involved in the ultimate decision to terminate Plaintiff. Plaintiff also asserts that, in response to voicing his concerns about racial discrimination, he was told by Mr. Tefft, Mr. Taylor, and Mr. Grant not to discuss his race at work and they refused to discuss race again. Taken together, this evidence gives rise to an inference of discriminatory intent surrounding Plaintiff's termination. *See id.* at 691–92 (finding sufficient evidence for an inference of discrimination in part because a non-Hispanic employee— who was one of the alleged harassers—was "hardly reprimanded (and, significantly, not terminated) after several complaints were made about his hostile behavior").

Moving to the second step of the framework, Defendant has provided a legitimate nondiscriminatory reason for Plaintiff's termination. Namely, Plaintiff was terminated for violations of the UPS expense policy.

At the third step, Plaintiff has cited sufficient evidence of pretext. Pretext can be established "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998), *as amended* (Aug. 11, 1998) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). A plaintiff "need produce very little evidence of discriminatory motive to raise a genuine issue of material fact." *Id.* (quoting *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991)). "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.* When the plaintiff offers indirect evidence, by contrast, "the plaintiff must produce 'specific, substantial evidence of pretext.'" *Id.* (quoting *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996)). *But see Chuang v. Univ. of California Davis, Bd. of Trustees,* 225 F.3d 1115, 1127 (9th Cir. 2000) (Plaintiff "does not necessarily have to introduce additional, independent evidence of discrimination at the pretext stage.").

Plaintiff argues that Defendant's nondiscriminatory reason is not credible for several reasons: (1) Mr. Nobles and Mr. Taylor approved Plaintiff's expense report on multiple occasions; (2) the allegedly impermissible fuel and mileage charges were business purchases that were duplicative, not problematic personal charges; (3) Plaintiff never received training on expense account submissions; (4) Plaintiff made a good faith effort to obtain review of his expense reports prior to submission; and (5) the personal charges that form the basis for

Defendant's termination decision in May of 2016 were made prior to the parties' February 11 meeting where Plaintiff was first reprimanded for his expense reports. Pl. Resp. 27–28, ECF 39. Plaintiff also cites other evidence of Defendant's discriminatory conduct, including condoning insubordination by employees, failing to investigate Plaintiff's reports of discriminatory conduct, rebuffing Plaintiff's complaints of discrimination, forbidding Plaintiff from mentioning race in the workplace, and his termination. *Id.*

Here, Plaintiff has offered enough evidence to survive summary judgment. Though Plaintiff was alerted on several occasions to issues with his expense reports, Mr. Nobles approved Plaintiff's expense reports for the periods in question. Plaintiff also sought review of his spring 2016 expense reports prior to their submission. According to Mr. Grant, Plaintiff's "double-dipping"—seeking both fuel and mileage reimbursement—was the primary reason Plaintiff was terminated. But Plaintiff also testified that he received permission from Mr. Nobles to charge both mileage and fuel for his rental car. Snyder Decl. Ex. G (Randall Dep.) 71:11–18. Finally, the alleged personal medical expenses were made in January, prior to the February 17, 2016 meeting about Plaintiff's expense reports. Viewed in the light most favorable to Plaintiff, Plaintiff's good faith effort to comply with the expense policy combined with the mixed messages he received from his supervisor regarding his expenses shed some doubt on Defendant's justification for Plaintiff's termination.

The circumstantial evidence of discrimination cited by Plaintiff further supports Plaintiff's argument for pretext. As described above, Mr. Nobles and Mr. Grant—both decision makers in this case—took a permissive response to Plaintiff's complaints of racial harassment by the part-time supervisors and Mr. Bond. When Plaintiff brought his concerns to Mr. Grant and others in the February meeting, he was told both never to bring up his race at work again and that

they were "not going to discuss race again." Randall Decl. ¶ 45. Plaintiff was also the sole African-American supervisor in the division. Such evidence is circumstantial evidence of pretext. *See McGinest*, 360 F.3d at 1123–24 ("GTE's permissive response to harassing actions undertaken by coworkers and supervisors, combined with the absence of black supervisors and managers in the workplace, also is circumstantial evidence of pretext."). Accordingly, Defendant is not entitled to summary judgment on Plaintiff's discrimination claims.

B.  Retaliation

Plaintiff also alleges that Defendant retaliated against him in violation of Title VII and Oregon law. *See* 42 U.S.C. 2000e-3(a); ORS 659A.030(1)(f), 659A.199. To make out a prima facie case for retaliation, a plaintiff must show that: (1) he was involved in a protected activity; (2) his employer took an adverse employment action; and (3) a causal relationship between the two. *See Brooks*, 229 F.3d at 928. "Like discrimination, retaliation may be shown using the *McDonnell Douglas* burden shifting framework," *McGinest*, 360 F.3d at 1124:

> [T]he burden of production shifts to the employer to present legitimate reasons for the adverse employment action. Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext. Only then does the case proceed beyond the summary judgment stage.

*Brooks*, 229 F.3d at 928 (internal citation omitted).

The parties only dispute the third element of the prima facie claim: causation. "[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  In other words, the plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions by employer." *Id.* at 360. "The causal link can be inferred from circumstantial evidence

such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and adverse action." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). Indeed, temporal proximity alone can be sufficient "where an adverse employment action follows on the heels of a protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). "[E]vidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant." *Passatino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 507 (9th Cir. 2000).

Plaintiff has cited sufficient evidence to support his claim for retaliation. At the time of his termination, Plaintiff had worked for UPS for over ten years. Since moving to The Dalles Center, Plaintiff complained about race and sex discrimination to his supervisors and to human resources. Plaintiff provides concrete examples of such reporting in September 2015; on October 1, 2015; on February 11 and 17, 2016; and on March 3, 2016. Within four months of his termination, Plaintiff informed his managers and human resources that he believed he was experiencing racial discrimination by his co-workers as well as Mr. Bond and Mr. Taylor. Such allegations were not investigated. Though temporal proximity alone may not be sufficient to survive summary judgment under these circumstances, here there is additional circumstantial evidence of retaliation. *See Clark County School Dist. v. Breeden,* 532 U.S. 268, 273–74 (2001) (per curiam) (citing cases finding a three-month period and a four-month period too long to rely on temporal proximity alone). In the same meeting in February where Plaintiff expressed his concerns about Mr. Bond and Mr. Taylor, Mr. Grant and Mr. Tefft deterred Plaintiff from making complaints of discrimination by telling him that they would not discuss race again.[4]

---

[4] Defendant suggests that Plaintiff's claim of temporal proximity fails because there were additional violations of the expense policy in May of 2016. Def. Reply 5; *see Curley v. City of North Las Vegas*, 772 F.3d 629, 634 (9th Cir. 2014) (finding "the *new* information revealed by the City's investigation defeats any causal inference that might otherwise follow from the

From this, a reasonable jury could conclude that—but for his reports of discrimination—he would not have been terminated.

As described in the preceding section, Plaintiff has also presented evidence that Defendant's proffered reason for his termination was mere pretext. Accordingly, summary judgment is also inappropriate on Plaintiff's claim for retaliation.

## C. Hostile Work Environment

Plaintiff also alleges that he was subject to a hostile work environment in violation of federal and state law. "To prevail on a hostile workplace claim premised on either race or sex, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a sexual or racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). When a plaintiff claims both race and sex discrimination, the court should analyze both factors together. *See Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1562 (9th Cir. 1994), *as amended* (Nov. 21, 1994), *as amended* (Dec. 14, 1994) ("[W]hen a plaintiff is claiming race *and* sex bias, it is necessary to determine whether the employer discriminates on the basis of that *combination* of factors, not just whether it discriminates against people of the same race or of the same sex.").

Hostile work environment claims require that the plaintiff show that his "workplace was permeated with discriminatory intimidation . . . that was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Brooks*, 229 F.3d 923–24 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)) (brackets

temporal proximity between his protected activity and his termination"). But, as described above, some of these "additional violations" were expenses preceding the February meeting, and Plaintiff alleges he was given mixed messages about best practices regarding the expense reports. The Court therefore declines to find that these additional violations defeat any inference of causation as a matter of law.

omitted). "The working environment must both subjectively and objectively be perceived as abusive," *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995), from the perspective of a reasonable person with the plaintiff's characteristics, *McGinest*, 360 F.3d at 1115. Courts look at the totality of the circumstances when considering hostile work environment claims. Those circumstances include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris*, 510 U.S. at 23). It is well established that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 788 (internal citations and quotation marks omitted).

When viewing the evidence in the light most favorable to Plaintiff, a reasonable African-American man in Plaintiff's position may have perceived this sexual and racial harassment as sufficiently pervasive to pollute his workplace. In addition to the sexually explicit text message from Ms. Kinder, Plaintiff was subject to rumors and questions by other employees about whether Plaintiff was having affairs. Plaintiff asserts that such comments offended him because they are rooted in stereotypes about the sexuality of African-American men. *See* Randall Decl. ¶ 28. In addition, Ms. Richardson is alleged to have commented that Plaintiff was a "black man" and "normally aggressive." Ms. Barrett attributed her work anxiety to Plaintiff's race, and both Ms. Richardson and Ms. Barrett went to Mr. Nobles, a white man, when given work instructions by Plaintiff. This conduct took place over a nine-month period. Such allegations constitute more than an "offhand comment" or "isolated incident." *Cf. Vasquez,* 349 F.3d at 644 (finding complaints of unfair treatment and two racial epithets over the course of more than one year

insufficient to constitute a hostile work environment). Taken together, a reasonable jury could conclude that this conduct was sufficient to create a hostile work environment.

"An employer may be held liable for creating a hostile work environment either vicariously (i.e., through the acts of a supervisor) or through negligence (i.e., failing to correct or prevent discriminatory conduct by an employee)." *Reynaga*, 847 F.3d at 688 (9th Cir. 2017). "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth*, 524 U.S. at 745. "[A]n employer is liable for a hostile work environment created by a plaintiff's co-worker if the employer knew or should have known, about the harassment and failed to take effective remedial action." *Reynaga*, 847 F.3d at 689 (internal citations and quotations omitted). Effective remedial measures must include some form of discipline that is "proportionate to the seriousness of the offense." *Id.* (internal citations and quotations omitted).

Thus, to the extent that the work environment was tainted by the acts of non-supervisory employees, Plaintiff must demonstrate that Defendant knew about the harassing conduct and did not take effective remedial measures in response to Plaintiff's complaints. Plaintiff contends time and again that he reported this conduct to both human resources and his manager, Mr. Nobles. There is a dispute of fact as to whether any of the complaints—including the offensive text messages—were adequately investigated. For example, Mr. Nobles confronted Ms. Kinder about her sexually explicit text message, but it was not investigated by human resources until after Plaintiff's termination nine months later. Plaintiff also contends that when he told Mr. Tefft and Mr. Grant about it on October 1, 2015, they were dismissive and acted like it was "Plaintiff's fault." Similarly, though Plaintiff alleges he reported the racially charged text from Ms. Barrett

to Mr. Nobles, Ms. Barrett testified that no one talked with her about the text. When Plaintiff discussed his difficulties with subordinate employees with the area manager of human resources, he was allegedly told to find a working relationship with these individuals. Again, viewing the evidence in the light most favorable to Plaintiff, the Court cannot say that as a matter of law Defendant adequately responded to Plaintiff's complaints of harassment.

D. Unpaid Wages

Plaintiff's final claim against Defendant is for unpaid wages in violation of ORS 652.140. ORS 652.140 provides: "When an employer discharges an employee or when employment is terminated by mutual agreement, all wages earned and unpaid at the time of the discharge or termination become due and payable not later than the end of the first business day after the discharge or termination." The statute sets strict time limits for when this amount must be paid to the employee. Plaintiff alleges that he has not been paid: (1) two weeks of accrued vacation in the amount of $3,093, (2) mileage reimbursement totaling $909.57, and (3) a bonus through the Management Incentive Program ("MIP") in the amount of $5,155.25. Plaintiff also seeks civil penalties in the amount of $9,280.50. Am. Compl. ¶ 100, ECF 15.

In this case, there is no genuine dispute of fact as to whether Plaintiff was paid the wages he was owed under the statute. As a preliminary matter, Plaintiff does not address any of this evidence in his response. Indeed, he includes no argument on this claim in his brief. He merely cites to his own declaration in his statement of material facts and asserts that these amounts remain unpaid. Pl. Resp. 24 (citing Randall Decl. ¶¶ 83–84).

As to the accrued vacation time, Defendant provides evidence that Plaintiff was owed two—not four—weeks of vacation at the time of his termination because vacation time is accrued on a pro-rata basis and his employment was terminated mid-year. Stewart Decl. Ex. 1.

Defendant also provides a copy of a June 8, 2016 earnings statement demonstrating that Plaintiff received compensation for eleven days of vacation the day after his termination. *Id.* at Ex. 2.

Defendant also demonstrates—and Plaintiff concedes—that he was reimbursed for mileage. Pl. Mot. 24; *see also* Stewart Decl. Ex. 5. A check for the full amount owed was delivered to Plaintiff's attorney in April of 2017. *Id.* Further, unpaid mileage is unlikely to constitute a violation of the statute as "wages" do not appear to include reimbursement for mileage under Oregon law. *See Oregon Ed. Ass'n v. Eugene School Dist. No. 4J*, 53 Or. App. 722, 728, 633 P.2d 28 (1981) (finding, under a different Oregon statute, that "reimbursement for mileage, meals and lodging expenses [do] not constitute 'salary'" or "wages" under the statute.); *State ex. rel. Nilsen v. Oregon State Motor Ass'n*, 248 Or. 133, 135–36, 432 P.2d 512 (1967) (Defining "wages" as "all earned compensation contracted to be paid by the employer for the employee's personal service regardless of the nature of such compensation.").

As to the MIP payment, Plaintiff alleges that he was owed $5,155.25. Plaintiff does not identify which year he was owed this payment. If Plaintiff is alleging he is owed a payment for 2016, Defendant provides evidence indicating that—having ended his employment in June of 2016—Plaintiff was not owed anything for the 2016 calendar year. Stewart Decl. at Ex. 6 at 9 ("Employees with a termination/separation date prior to 12/31/2016 will be ineligible" for the MIP award.). If Plaintiff is suggesting that he never receive a payment in 2015, this assertion is belied by the evidence in the record. Defendant provides a Management Incentive Program Award Statement indicating that Plaintiff was paid the 2015 MIP payment in the amount of $5,155.25 owed to him in March of 2016. *Id.* at Ex. 7.

In light of the evidence provided by Defendant, the Court finds that no reasonable jury could conclude that Plaintiff was not paid wages owed to him under ORS 652.140 at the time of

his termination in June of 2016. Accordingly, the Court grants Defendant summary judgment on this claim.

## II.        Defendant's Counterclaims

Defendant brings a counterclaim for breach of contract. To establish a breach of contract claim under Oregon law, the plaintiff "must allege the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff." *Slover v. Or. St. Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570–71, 927 P.2d 1098 (1996) (internal quotation omitted). Defendant alleges that Plaintiff breached his agreement to repay Defendant for personal expenses he improperly charged to UPS. Def. Mot. 32–33. Plaintiff's sole response to Defendant's claim is that the contract is invalid because he signed the contract under duress.

Economic duress has three elements: "(1) wrongful acts or threats; (2) financial distress if the threatened party does not comply with the wrongdoer's demand; and (3) the absence of any reasonable alternative to the terms presented by the wrongdoer." *Comcast of Oregon II, Inc. v. City of Eugene*, 21 Or. App. 573, 586, 155 P.3d 99 (2007). "Whether particular facts amount to duress is a question of law, but the underlying facts, including whether the party claiming duress acted as a reasonably prudent person in choosing the alternative that was chosen, are for the jury decide." *Id.* As the Oregon Court of Appeals has previously held, "[i]t is well established . . . that threats to do what the threatening person had a legal right to do does not constitute duress." *Or. Bank v. Nautilus Crane & Equip. Corp.*, 68 Or. App. 131, 1443, 683 P.2d 95 (1984).

Plaintiff's argues that Defendant "wrongfully threatened to terminate" his employment. Pl. Resp. 37. He contends that the threat was wrongful "because UPS had no basis for obtaining the moneys from [Plaintiff] to begin with." *Id.* Generally, in an at-will employment relationship,

a threat to terminate employment cannot constitute a "wrongful threat." *See Duncan v. Office Depot*, 973 F.Supp. 1171, 1173 (D. Or. 1997) ("Plaintiff cannot prove the first element, that defendants act in changing the terms of the employment contract with plaintiff was wrongful, since an employer is free to change the terms and conditions of employment prospectively at any time."); *see also Salesky v. David Peyser Sportswear, Inc*., No. 94 CIV. 9036 (JSM), 1996 WL 262985, at *2 (S.D.N.Y. May 17, 1996) (finding under New York law, which is similar to Oregon, that "threats to fire an at-will employee are not unlawful and cannot form the basis for a duress claim").

In this case, however, Plaintiff alleges that he was treated differently and ultimately terminated by Defendant because he is an African-American man. In addition, Plaintiff alleges he received mixed information from Defendant throughout his employment regarding his expenses, shedding some doubt as to whether Defendant had any basis—other than an improper one—for threatening to terminate Plaintiff. On these facts, the Court declines to find that as a matter of law that Plaintiff cannot prove his defense of economic duress. Accordingly, the Court denies Defendant's motion for summary judgment on its breach of contract claim. [5]

///

///

///

///

///

---

[5] Because the Court has not determined whether Defendant can succeed on its breach of contract claim, the Court declines to address Defendant's alternative claim for unjust enrichment/quantum meruit as the two claims are "mutually exclusive." *U.S. ex rel. TBH & Assocs*., *LLC v. Wilson Const. Co*., 965 F. Supp. 2d 1215, 1236 (D. Or. 2013) (quoting *Ken Hood Constr. Co. v. Pacific Coast Constr., Inc*., 203 Or. App. 768, 772, 126 P.3d 1254 (2006)) ("'[I]f the parties have a valid contract, any remedies for breach flow from that contract, and a party cannot recover in quantum meruit for matters covered by the contract.'").

## CONCLUSION

The Court DENIES in part and GRANTS in part Defendant's Motion for Summary Judgment [31]. The Court dismisses Plaintiff's claim for unpaid wages under Or. Rev. Stat. § 652.140 with prejudice. Defendant's motion is otherwise denied.

IT IS SO ORDERED.

Dated this _____ day of October, 2018.

MARCO A. HERNÁNDEZ
United States District Judge